## NEW YORK GENERAL SESSIONS.

### THE PEOPLE agt. BRUNELL and others.

*Cruelty to animals.*

The trial in this case was upon an indictment for cruelty to animals. Judge SUTHERLAND, in an elaborate charge to the jury, delivered in his usual able and eloquent style, discloses valuable information as to the origin of this new law, and its application in suppressing and alleviating the torture and cruelty to the animal race, which frequently occurs, and which, before the passage of this humane and remedial statute, seems to have been practiced with impunity, especially by individuals of hasty, violent and ungovernable passions. " A merciful man is merciful to his beast," is a saying as true now as it was when first uttered.

At common law, cruelty to an animal merely upon the ground that it gave pain to the animal, and for the protection or for the sake of the animal, was not indictable. Although under certain circumstances acts of cruelty when publicly committed, to the annoyance of the public, or when committed with a malicious intent to injure the owner of the animal might have been indictable at common law.

This modern legislation, for the purpose of preventing unjustifiable cruelty to animals is the result of modern civilization, cultivated by the christian religion, arts and science.

Certainly, the purpose of these acts is praiseworthy. It is impossible for a high-minded man to say that unjustifiable cruelty is not a wrong — a moral wrong at all events, and why should not the law make it a legal wrong?

Mr Bergh's efforts, and the efforts of the officers of his society, in a discreet and judicious manner, to enforce these laws for the protection of animals and to prevent cruelty to them, deserve all praise.

The indictment in this case contains three counts. The first substantially charges that the defendants caused the horse mentioned in the indictment to be " overdriven." The second count intends to charge that the horse mentioned in it was caused by the defendants, in legal effect, to be cruelly and unjustifiably " overloaded." The third count substantially charges that the defendants caused the horse mentioned in it to be " tortured and tormented," by causing him to be hitched to a vehicle or

omnibus, and driven and required to do the work which he was called upon to do under those circumstances, when he was in a certain condition as to strength, health and ability to do work, when he was suffering from certain ailments, defects and unsoundness specially stated in all the counts of the indictment.

The court charged the jury that if they were satisfied from the evidence that the horse was ailing, and defendants, Brunell and John Marshall, knowing this fact, caused the horse to be harnessed, driven and worked, as alleged in the second count of the indictment, they willfully, unjustifiably and cruelly caused the horse to be overloaded. And further charged, that if the jury were also satisfied from the evidence, that the defendants, Brunell and John Marshall, considering the condition of the horse, cruelly, willfully, unnecessarily and unjustifiably caused the horse to be driven and worked as alleged in the third count of the indictment, the horse necessarily was caused to suffer torture or torment or great bodily pain, and the jury should convict the two defendants, Brunell and John Marshall, of the offenses charged in said second and third counts of the indictment.

The court stated to the jury that the question, really, was not whether these defendants intended to torture the horse; the question really was whether they willfully caused certain things or acts to be done which did necessarily torture the horse.

*November,* 1874.

*Before Hon.* JOSIAH SUTHERLAND, *City Judge, and a jury.*

TRIAL upon indictment of the superintendent and proprietors of a line of city stages for causing and procuring a horse to be overdriven, &c. The facts appear in the charge to the jury.

*Horace Russell,* assistant district attorney, *and Elbridge T. Gerry,* for the people.

*John R. Fellows and John B. Haskin,* for the prisoners.

SUTHERLAND, *City Judge* (charged the jury as follows): *Gentlemen of the jury.*— This indictment was not drawn for a common law offense. It was drawn under certain statutes

People agt. Brunell.

of this state to prevent cruelty to animals. It is not very important whether at common law it was an indictable offense to unjustifiably torture or inflict pain on an animal, on the ground that pain was thereby inflicted on the animal. My opinion is, that at common law, cruelty to an animal merely upon the ground that it gave pain to the animal and for the protection or for the sake of the animal was not indictable. I have very little doubt but that I am correct about that; though I stated that under certain circumstances, acts of cruelty when publicly committed to the annoyance of the public, or when committed with a malicious intent to injure the owner of the animal, might have been indictable at common law.

I suppose this modern legislation, for the purpose of preventing unjustifiable cruelty to animals, is the result of modern civilization, the humanity, I may say, which has sprung from, and has been cultivated by the christian religion, and by or through the art of printing, by which information upon subjects of morality and science, and a thousand other things, has been so easily spread throughout the community. Now, certainly, the purpose of these acts is praiseworthy. It is impossible for a right minded man, it appears to me, to say that unjustifiable cruelty is not a wrong, a moral wrong at all events, and why should not the law make it a legal wrong? Pain is an evil. Why should dumb creatures, domesticated to obey us, confiding in us, indebted to us for their food and subsistence, bound and taught to obey us, be unnecessarily and unjustifiably inflicted with pain? Have not they a right to appeal to the legislature for protection? Now, I think, all agree that Mr. Bergh's efforts, and the efforts of the officers of his society, in a discreet and judicious manner to enforce these laws for the protection of animals, and to prevent cruelty to them deserve all praise.

This indictment contains three counts. The first count substantially charges that the defendants caused the horse mentioned in the indictment to be " overdriven." It may

be said with sufficient accuracy that the second count of the indictment intends to charge that the horse mentioned in it was caused by the defendants, I may say in legal effect, to be cruelly and unjustifiably " overloaded ; " and it may be said that the third count substantially charges that the defendants caused the horse mentioned in it to be "tortured and tormented," by causing him to be hitched to a vehicle or omnibus, and driven and required to do the work which he was called upon to do under those circumstances, when he was in a certain condition as to strength, health and ability to do work, when. he was suffering from certain ailments, defects, and unsoundness specially stated in all the counts of the indictment ; and that in so causing him to be harnessed to the omnibus, and driven while he was in that condition, they caused him to suffer torment and torture. To convict the defendants, Brunell and John Marshall, under the second count of the indictment, you should be satisfied from the evidence that they willfully caused the horse to be harnessed to the omnibus, and to be driven and worked, as the evidence tends to show, that the horse was being driven and worked when stopped and unharnessed in the Fourth avenue, on the twenty-fourth of September ; and, also, that when they so caused the horse to be driven and worked, they knew the condition of the horse in respect to his health, strength, soundness or unsoundness, ailments, fitness and ability to do the work ; and, considering the condition of the horse in the respects just stated, you may find from the evidence the horse was ailing, when he was so caused to be harnessed, driven and worked, that the defendants, Brunell and John Marshall in causing the horse to be so harnessed, driven and worked, willfully, unjustifiably and cruelly caused the horse to be overloaded. To convict under the third count of the indictment, I charge you, that you should be satisfied from the evidence that they (these two defendants) willfully caused the horse to be harnessed and attached to the omnibus, and to be driven and worked, as the evidence tends to show the horse was

being driven and worked when stopped and unharnessed in the Fourth avenue, on the twenty-fourth of September, and that when they so caused the horse to be driven and worked, they knew the condition of the horse in respect to his health, strength, soundness or unsoundness, ailments, fitness, ability to do the work, and considering the condition of the horse in the respects just stated, you may find from the evidence the horse was in when he was so caused to be harnessed, driven and worked, if you are further satisfied from the evidence that in causing the horse to be driven and worked, as he was being driven and worked when stopped and taken out of the harness on the twenty-fourth of September, the horse necessarily was caused to suffer torture or torment, or great bodily or physical pain. And, if you are further satisfied from the evidence that the defendants Brunell and John Marshall, considering the condition of the horse, cruelly, willfully, unnecessarily and unjustifiably caused the horse to be so driven and worked and to suffer such torture, torment or pain, then you will convict the defendants Brunell and John Marshall of the offense charged in the third count of the indictment. Certain witnesses, introduced on the part of the people, have testified in this case to the condition of the horse when taken out of the omnibus and unharnessed. Those witnesses are Mr. Bergh, the officer belonging to the society, who stopped the stage, the French veterinary surgeon (Dr. Liantard) and three or four other veterinary surgeons whose names you will recollect. Now, of course, it is for you to determine as to the credibility of these witnesses; it is for you to say whether you believe them or not, and it is for you to say what their evidence, if true, tends to show. But I assume, for the purposes of my charge, that the evidence these gentlemen have given, if true, tends to show that this horse was in a very diseased condition, full of ailments. They do not exactly agree. Some of these veterinary surgeons say they did not examine the horse, with reference to certain defects or diseases, but I think it may be said that the most of them, nearly all of them, agree

about the condition of the horse. It struck me that the French veterinary surgeon (Dr. Liantard) was a remarkably intelligent man, from his manner and the answers to the questions. He appears to have come here certainly in no way connected with either the defendants or the complainant, though it seems he had been occasionally requested, as in this case, to look at horses, but he said he had never been in the habit of charging anything for his services. Now, I assume, that the testimony of these witnesses substantially tends to show that this horse had a crack in one of his fore feet from the toe up to the hair, and I think a greater crack on the other foot. I recollect distinctly Mr. Bergh swearing that when he saw the horse, I do not recollect whether it was the day he was taken out of the stage, or the next, but at all events about that time, when he saw the horse, blood and matter was running out of a crack in one foot. Well, their evidence tends to show, I assume, that he was badly knee-sprung in both knees; that he was spavined in both hind hocks. One of them distinctly swore, if I remember, that the fetlock-joints of the hind legs were stiff and did not work. Then one of the veterinary surgeons swore that he had what is called "sweeny," a wasting away of the shoulders; and I believe of all of them tended to show that there were certain excoriations of the skin above the fore feet; some evidence tending to show that this was probably done by stumbling. Then I may say that the evidence of all these witnesses, if true, and you believe it, tends to show that this horse was in an unfit condition to work. Some of them, I am sure, expressed the opinion that it must have given great pain or torture, to be worked in the condition he was in — that it was a cruel act to put him to work in that condition.

On the point as to the condition of the horse, various witnesses were called and have testified on the part of the defendants. The defendants Brunell and John Marshall were called and sworn; I believe all the defendants named in the indictment were called and sworn, and also one veterinary

surgeon and other witnesses.   I may say that their evidence
tends to show that this horse was knee-sprung; and, perhaps,
some of them testified that he was badly knee-sprung.   I do
not recollect that any of them said he was spavined; you will
recollect what their evidence was.   Some of them stated that
he had one disease or defect, and some another.   I think it
may be said that their evidence, upon the whole, tended to
show that the horse was in a fit condition to work, and that
it was not a cruel thing to hitch him to the omnibus by the
side of another horse, and to compel him to do the work
expected or required of him in performing his omnibus route.
One of these witnesses went so far as to swear — I think it
was the defendant John Marshall — that when this horse was
taken out of the stage, that in his opinion he could be driven
forty miles in six hours.   That is a pretty good gait.   And I
may say that some of these witnesses appeared to have
intended to express the opinion, that the fact of the horse
being knee-sprung and spavined, did not or would not hurt
him for work, and upon the whole, that it was a good thing
for him — that he was better off for being worked.   Now,
you will see, gentlemen, at once, that it will be necessary for
you, from all this evidence relating to the condition of the
horse, to determine, in view of the instructions I have
given you, what was the condition of that horse, because
you have got to determine whether it was unjustifiable and
cruel for the defendants, if they did cause him to be harnessed
and then driven and worked, to do so.   Well that, of course,
depends upon the condition of the horse, and probably it will
be advisable and prudent for you, in the first place, to deter-
mine from the evidence, what was the condition of the horse,
what state was he in as to health, ailments and ability to work.
Now, gentlemen, I suppose even a New York omnibus horse
may become unfit for work; I suppose that even a New York
omnibus horse may be in such a condition in respect to debility, ,
infirmity, strength, unsoundness, ailments, &c., that to hitch
him to an omnibus and drive and work him as the horse

mentioned in the indictment was being driven and worked, when the stage was stopped and he was taken out by one of the officers of Mr. Bergh's society, would be an act of cruelty. There is no pretense in this case, there is no evidence tending to show, that these defendants we are now trying, if they did cause this horse to be harnessed and thus driven, caused him to be so harnessed and driven, maliciously, or for the purpose of torturing and giving pain to the animal. The indictment does not allege any such thing. The indictment does not allege, nor was it necessary in my opinion for it to allege, that the defendants, in causing or by causing the horse to be harnessed and worked, intended to torture or to torment or to give him pain. If they caused him to be harnessed to the omnibus, and driven of course, they intended that he should do the work, with the aid of the other horse hitched with him, required of them. No matter how sick the horse was, no matter how diseased he was, if he was able to hold up and to tug along and do his work along side of the other horse down to the limit of the stage route and back again to the stable, he earned just as much money for them for that trip as though he had been one of those celebrated horses of Mr. Bonner. Now, whatever you may find from the evidence was the condition of the horse, as to his health and strength and bodily ailments, is it or is it not to be presumed from the evidence, that the superintendent, Mr. Brunell, and Mr. John Marshall, knew that condition; and, if you find he was in such a condition that the driving him and compelling him to do the work that he was doing when stopped, necessarily caused him torture, torment or great pain, are you not authorized from the evidence to presume that they knew that such driving and working would or must necessarily cause such pain, torment or torture. If they knew as much about the condition of the horse as you have found out from the evidence, knew his condition, and you find that in driving the horse as he was being driven, and in compelling him to work, as he was being compelled to work, the horse was necessarily caused

to suffer torture, torment or great pain, must these defendants not be presumed to have known, if they caused the horse to be so driven and worked, that such would be the effect on or as to the horse? The maxim of the law is, that every person who willfully and intentionally does a certain act, which act is necessarily followed by certain results or consequences, must be presumed to have intended such results or consequences. He must be presumed to have known that such results would follow the act. It has been said that it was necessary to be shown on the part of the people, to authorize a conviction under either of these counts, that the defendants intentionally tortured the horse, intentionally gave him pain, intended to torture the horse. I have said that there is no such allegation as that in the indictment, and I repeat to you that I do not think it necessary that there should be such an allegation in the indictment. The question really is not, gentlemen, whether they intended to torture the horse; the question really is, whether they willfully caused certain things or acts to be done which did necessarily torture the horse. A. B. is seen most unmercifully and cruelly beating a horse over the head with a club or a cart rung. He is indicted for cruelly beating him, and he is being tried, and he is called as a witness on his own behalf and he swears: "True, I beat the horse, but I did not intend to hurt him; I beat him just as it is charged; I struck him repeatedly over the head with a cart rung, but I did not intend to hurt him." Would that evidence amount to anything? How are you to get at men's intentions, except from their acts and declarations? I have not intended to refer to the evidence at all in detail. I trust entirely to your memory as to what it is. I do not want to express an intimation about any question of fact in this case. I leave all such questions entirely to you. I had intended to confine my charge to points of law. I have substantially charged, that to convict the two defendants, Brunell and John Marshall both, you must find that they both caused the horse to be driven and worked so and so. That needs some expla-

nation. The language of the indictment is, that the defendants named in the indictment caused, &c. The question is, whether the evidence shows that the defendants, Brunell and John Marshall, or either of them, and if only one, which of them, did so willfully contribute to, or so willfully promote, or procure, the commission of the alleged offense in the indictment, as that it can be said that, in legal effect, they or he caused the commission of the offense. The driver, Daniel Kane, probably hitched the horse with another to the omnibus. The driver, Daniel Kane, directly compelled the horses to move along and draw the omnibus. He was the man that directly compelled the horse to do that, in the doing of which the horse suffered the pain or torture, if he did so suffer. But the offense charged in the indictment is a misdemeanor, and the law is, that if A. B. procures C. D. to commit a misdemeanor, both A. B. and C. D. are criminally responsible as principals, though A. B. may not have been present when the misdemeanor was committed. The general principle of law is, that all who willfully or materially aid in procuring the commission of a misdemeanor, or who willfully in any way contribute to its commission, are criminally responsible, though not present when committed. The driver, who drove the omnibus to which the horse was attached on the twenty-fourth of September, was not indicted. The indictment is against others (the proprietors and superintendent) for causing the horse to be harnessed, driven and worked in the condition which the indictment alleges the horse was. If you are satisfied from the evidence, beyond a reasonable doubt, that, considering the condition of the horse, it was an act of unjustifiable cruelty and torture to drive and work the horse as he was being driven and worked, and that the defendants, Brunell and John Marshall, knowing such condition of the horse, willfully, in any way, aided materially in procuring or causing the commission of the act of torture and cruelty, or materially and willfully contributed to its commission, then you ought to convict them. Certain evidence has been received

for the purpose of showing that both of these defendants really ought to be held criminally responsible for the alleged act of cruelty and torture, if it was an act of unjustifiable cruelty and torture. I submit to you the whole of the evidence on this point. It is for you to say whether, from the evidence of the defendant, John Marshall, and of others, it is not to be presumed that he knew the condition of the horse when driven and worked, as alleged in the indictment, and for some time previously. He was one of the proprietors. Of course, the superintendent was under his orders, and it must be presumed would obey any order he gave. It appears from the evidence, his own evidence and other evidence, that he was from time to time in the stable where the working horses were. That he sometimes looked them over. Does not the evidence then tend to show that he did know the condition the horse was in on the twenty-fourth of September, when, in the afternoon, he was hitched to the omnibus, and had been in for some time previously? He had but to say to the superintendent "that horse is unfit to work, send him to the hospital," and he would have been sent there. Is it not inferable from the evidence, that instead of doing so, the defendant, John Marshall, knowing the condition of the horse, left him among the omnibus working horses in the stable, to be required and compelled to do the ordinary routine work of a working omnibus horse? Now, considering all the evidence, are you not authorized to find from the evidence that the defendant, John Marshall, did, knowing the condition of the horse, willfully contribute to the commission of the alleged act of cruelty and torture, if the act was an act of unjustifiable cruelty and torture? Well, now, if you think not, find him not guilty. As to the defendant, Brunell, was he not the superintendent? Does not the evidence tend to show that Daniel Kane, the driver, in driving the horse was obeying the orders of the superintendent? That he was acting under the orders of the superintendent of the stables? It is for you to determine, as a question of fact, whether he (Brunell) did not cause the horse to be driven and worked as

alleged in the indictment. Mr. Fellows has requested me to charge, and I do charge, that as to any fact or circumstance which you must find did exist or did take place necessary to convict these two prisoners or either of them, from the evidence, you should be satisfied beyond a reasonable doubt; if you have a reasonable doubt, the prisoners are entitled to the benefit of that doubt, but I charge you in that connection, that the doubt must be one arising legitimately from the evidence, and not simply the result of that unwillingness to convict which is often the weakness of timid-minded jurors. It ought to be a doubt arising from the evidence; that does not mean that a juror is authorized to sit back in his chair and say, " Well, I won't convict these people anyhow; I don't believe in Bergh." That would not be a doubt. If your doubt arises from such a feeling as that, it does not arise from the evidence. Well, now, I do not suppose such a remark is necessary to be made to this jury. We have been fortunate this term in having most intelligent jurors. It appears to me that the jurors in this court, somehow, are generally much more intelligent than in other courts. The whole questions in this case mainly are addressed to your common sense. The question as to the condition of the horse, and what the necessary effect of driving him, is a question which you can better determine, I am quite sure, than either counsel or myself. You probably have had more experience in such matters, I think this is a very important case. I do not know but that I might be pardoned a poetical exaggeration if I should suggest that the thousands of omnibus horses in this city, which are daily hammering away their existences in drawing vehicles, weighing from 2,000 to 2,600 pounds, over the hard stone pavement of this city, containing from one to nine passengers or more, weighing upon an average perhaps 150 pounds apiece — are now pleading with you not to convict these prisoners against evidence or law, but to do this — to carefully examine the evidence, and honestly and carefully render a verdict according to the law and the evidence, free from any prejudice or feeling.

I meant to have read to this jury certain portions of the statutes. I think I ought to do so before they go out. I consider the act of 1874 merely explanatory, supplementary, to the act of 1867. Gentlemen, I meant to have read to you the provisions of the statutes which, I think, bear upon the questions that you have heard discussed here. It may be said, I think, that the indictment was drawn under the first section of the act passed April 12th, 1867. It is entitled " An act for the more effectual prevention of cruelty to animals." Now, the first section of that act is this: " If any person shall overdrive, overload, torture, torment, deprive of necessary sustenance, or unnecessarily or cruelly beat, or needlessly mutilate or kill, or cause or procure to be overdriven, overloaded, tortured, tormented, or deprived of necessary sustenance, or to be unnecessarily or cruelly beaten, or needlessly mutilated or killed, as aforesaid, any living creature, every such offender shall, for every such offense, be guilty of a misdemeanor."

Now, I will read two sections from a subsequent act, passed in 1874: Section first. " Every person who shall willfully set on foot, or investigate, or move to, or carry on, or promote, or engage in, or do any act toward the furtherance of any act of cruelty to any animal, shall be guilty of a misdemeanor." Now, the eighth section of that act is this: " In this act, and in every law of this state passed, or which may be passed relating to, or affecting animals, the singular shall include the plural; the words 'animal' or 'dumb animal' shall be held to include every living creature; the words 'torture,' 'torment,' or 'cruelty,' shall be held to include every act, omission, or neglect, whereby unjustifiable physical pain, suffering, or death is caused or permitted; and the words 'owner' and 'person' shall be held to include corporations as well as individuals. But nothing in this act shall be construed as prohibiting the shooting of birds for the purposes of human food."

The jury, without leaving their seats, returned a verdict of " guilty " against both defendants. The court sentenced Brunell to a fine of $200, and John Marshall to a fine of $250.