PEOPLE ex rel. FREEL v. DOWNS.

SAME v. SMITH.

(City Magistrate's Court of New York City. October, 1911.)

1. ANIMALS (§ 40*)—CRUELTY—CARRYING IN CRUEL MANNER—"ANIMAL."
   Under Penal Law (Consol. Laws 1909, c. 40) § 180, declaring that the word "animal," as used in the article, includes every living creature other than the human race, green turtles imported and used for food are animals within section 189, providing that a person who carries or causes to be carried in or on any vessel or vehicle any animal in a cruel and inhuman manner, or so as to produce torture, is guilty of a misdemeanor.
   [Ed. Note.—For other cases, see Animals, Cent. Dig. §§ 101–106; Dec. Dig. § 40.*
   For other definitions, see Words and Phrases, vol. 1, pp. 397, 398.]

2. ANIMALS (§ 42*)—CRUELTY TO ANIMALS—"TORTURE."
   Under Penal Law (Consol. Laws 1909, c. 40) § 180, defining "torture" or cruelty to animals to include every act, omission, or neglect whereby unjustifiable physical pain, suffering, or death is caused or permitted, whether piercing of the fins of green turtles and tying them by means of thongs while they were being transported to New York caused unjustifiable physical pain, was for the jury.
   [Ed. Note.—For other cases, see Animals, Cent. Dig. §§ 108–114; Dec. Dig. § 42.*
   For other definitions, see Words and Phrases, vol. 8, pp. 7009, 7010.]

3. ANIMALS (§ 42*)—CRUELTY TO ANIMALS.
   In a prosecution for cruelty to animals, evidence that the consignee of live turtles on their arrival at dock placed them in a wagon for transportation to a warehouse, breast to back, one against the other, each resting on the tail end of its carapace, was insufficient to show the infliction of unjustifiable physical pain, in the absence of proof that such position was likely to cause avoidable pain, or that defendant intended to inflict pain on them in so transporting them.
   [Ed. Note.—For other cases, see Animals, Cent. Dig. §§ 108–114; Dec. Dig. § 42.*]

4. CRIMINAL LAW (§ 108*)—CRIME—SITUS.
   A crime is essentially local and can be prosecuted and punished only in the sovereignty offended.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 220–226, 230, 231, 234; Dec. Dig. § 108.*]

5. COMMERCE (§ 1*)—WHAT CONSTITUTES.
   "Commerce," as used in Const. U. S. art. 1, § 8, providing that Congress shall have power to regulate commerce with foreign nations, among the several states, and with the Indian tribes, involves trade and commercial relations and intercourse among citizens of different states or countries, and comprehends navigation between the United States and foreign countries, and the transportation by land or water of persons or

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

property between the different states and in foreign countries constitutes interstate and foreign commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 1, 2; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 2, pp. 1287–1298; vol. 8, pp. 7606, 7607.]

**6. COMMERCE (§ 12*)—REGULATION—STATE LAWS.**
While each state is entitled by the exercise of its police powers to legislate in local matters, it may not tax, burden, or restrict interstate or foreign commerce by laws even which operate wholly within its own jurisdiction.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 7, 9; Dec. Dig. § 12.*]

**7. COMMERCE (§ 12*)—FOREIGN COMMERCE—REGULATIONS.**
Shippers have an absolute right to bring into the United States, or into any state, merchandise for disposition in the commerce of the land without hindrance or restriction on the part of the state into or through which it comes; such merchandise not being subject to state regulation until it becomes part of and is mixed with the general mass of property of the state.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 7, 9; Dec. Dig. § 12.*]

**8. COMMERCE (§ 10*)—IMPORTATION—CARRIAGE—FEDERAL STATUTES.**
Pen. Code U. S. (Act March 4, 1909, c. 321, 35 Stat. 1137 [U. S. Comp. St. Supp. 1911, p. 1663]) § 241, prohibiting the introduction of certain birds and animals injurious to agriculture, and declaring that no person shall import into the United States any foreign wild animals or bird, except under special permit from the Secretary of Agriculture, or for natural, historical, and scientific purposes, etc., had no application to the manner of importation and shipment of foreign turtles to be used for food.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 8; Dec. Dig. § 10.*]

**9. COMMERCE (§ 10*)—FOREIGN COMMERCE—LOCAL REGULATIONS—IMPORTATION OF LIVE ANIMALS—CRUELTY.**
Congress not having prescribed any statute regulating the manner in which turtles to be used for food shall be imported and not having prohibited cruelty with reference to such importation, such turtles, having been restrained on board a ship in a cruel manner, were within Penal Law (Consol. Laws 1909, c. 40) § 189, prohibiting the carrying of an animal in a cruel manner, as soon as the vessel arrived within the waters of the state, notwithstanding the manner in which the turtles were restrained was not an offense at the point of shipment.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 8; Dec. Dig. § 10.*]

Cleveland H. Downs and Walter Smith were informed against for cruelty to animals, and they move to quash complaints. Complaint quashed against defendant Smith, and defendant Downs held to answer.

Elliott, Jones & Fanning (George F. Elliott, of counsel), for complainant.

Burlingham, Montgomery & Beecher (W. S. Montgomery, of counsel), for defendant Downs.

Harry E. Lewis, for defendant Smith.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

FRESCHI, City Magistrate. These proceedings were instituted under the act (Laws 1910, c. 659, § 82) governing the inferior courts of criminal jurisdiction on two separate informations filed by Thomas F. Freel, superintendent of the American Society for the Prevention of Cruelty to Animals, against the defendant Walter Smith, and one against the defendant Cleveland H. Downs, charging certain acts of cruelty to 65 turtles. By stipulation of counsel, the several cases, based as they are on three specific charges of cruelty to animals, were heard jointly, and the evidence in the examination thereof was taken at one hearing, so that the same evidence was made applicable to all the complaints with the same force and effect as though each case had been separately examined.

The evidence adduced before me establishes substantially these facts: That some time in the month of March, 1911, in a foreign jurisdiction, to wit, the Republic of Cuba, 65 green turtles, commonly used for food, with their fins or flippers perforated and tied together on each side by means of rope passing through the perforation, were loaded and placed on board the steamship Saratoga, under said Capt. Cleveland H. Downs, in the mercantile marine plying between Havana and the port of New York; that each of said turtles with fins so pierced and bound was placed on its back or shell on the deck of said steamer, in which condition and position it was permitted to remain until the steamer docked at Pier 14, East River, Manhattan borough, city of New York, and when the turtles were actually delivered to the consignee, Walter. T. Smith, one of the defendants, by the master of said steamer. It was not shown who was responsible for the landing of the said turtles in the condition described on the steamer for transportation.

The complainant testified that at the time of the actual delivery of the shipment of turtles to the defendant Smith, at the said pier, he had a conversation with this defendant, in the course of which he said to the complainant, Mr. Freel:

"I am the consignee of these goods, and I would like to get them off the vessel just as soon as possible. I have been doing this for years, and have been in the business 25 years."

It is claimed that the said defendant thereupon caused the strings or cords holding the flippers of the turtles to be cut, and ordered the removal of the turtles from the steamer to a vehicle for transportation to the warehouse. While the said turtles were in transit from the steamer to No. 218 Front street, in the city and county of New York, they were stacked one against the other on the end of their shells, and in this position the carrying of the turtles from the steamship pier to the warehouse, about five blocks away, occupied but a very short space of time. The defendants do not dispute these facts.

The information against the defendant Downs, the captain of the steamer, alleges that he caused, procured, and permitted the said turtles in the condition described to be placed on his steamer for transportation, all of which caused these living creatures unnecessary and

unjustifiable pain and suffering while they were in transit within the boundary of the state of New York, in violation of the Penal Law (Consol. Laws 1909, c. 40) § 189.

One complaint against the defendant Smith charges him individually and as consignee, with a similar violation; and in the second complaint he is charged with willfully causing, procuring, and permitting the 65 turtles to be loaded on a dray, stacked breast to back, one against the other, and each resting on the tail end of its carapace, and then carried through the streets of Manhattan borough from Pier 14, East River, where the Saratoga docked, to No. 218 Front street, a warehouse, in said borough, several blocks away. At the time the turtles were transported to the warehouse their fins had been freed from the rope that originally bound them.

At the close of the people's case, motions to dismiss the complaint were made by the counsel for the respective defendants. In behalf of the defendant Downs, it was urged:

"That there is no violation of law, a failure of proof; and that there is no evidence showing that there is any unjustifiable pain or torment; and that the court has no jurisdiction over the offense, if there was an offense."

The defendant Smith, through his counsel, joined in this motion.

[1] The statute on which the complaint is predicated provides:

"Sec. 189. Carrying animal in a cruel manner. A person who carries or causes to be carried in or upon any vessel or vehicle or otherwise any animal in a cruel or inhuman manner, or so as to produce torture, is guilty of a misdemeanor."

The first consideration, therefore, for determination calls for a definition of an animal, and we must inquire if a turtle is within the meaning and intent that the Legislature gave to the word "animal" in that section. Notwithstanding that a turtle is a species of reptile, still the lawmakers of our state have given us the following definitions in the Penal Law, § 180:

"The word 'animal,' as used in this article, does not include the human race, but includes every other living creature."

The classification made by this legislative enactment gives to the word "animal" a far-fetched and somewhat strange meaning—strange because it includes all that lives on, over, and in the earth, as well as all things that live in the waters of the world. But since the lawmaking body has prescribed a definition we must be guided by it, and therefore I must hold that a turtle is, to all intents and purposes, an animal within the meaning of section 189 of the Penal Law as such word is used in the complaint herein.

[2] Having disposed of this question, the next that arises for settlement is the meaning of the word "torture" in the statute under consideration. Again we find that section 180 of the Penal Law defines "torture" as follows:

"The word 'torture' or 'cruelty' includes every act, omission, or neglect whereby unjustifiable physical pain, suffering or death is caused or permitted."

In this connection it may be well to read the provisions of section 185 of the Penal Law, which provides that:

"A person who overdrives, overloads, tortures or cruelly beats, or unjustifiably injures * * * any animal, whether wild or tame, and whether belonging to himself or to another, or deprives any animal of necessary sustenance, food or drink, or neglects or refuses to furnish it such sustenance or drink, or causes, procures or permits any animal to be overdriven, overloaded, tortured, cruelly beaten, or unjustifiably injured * * * or to be deprived of necessary food or drink, or who willfully sets on foot, instigates, engages in, or in any way furthers any act of cruelty to any animal or any act tending to produce such cruelty, is guilty of a misdemeanor."

Congress has enacted a law to the same effect, practically, by the Act of June 29, 1906, c. 3594, 34 Stat. 607 (U. S. Comp. St. Supp. 1911, p. 1341), commonly known as the "24-Hour Law."

Before passing to the question of jurisdiction raised by the learned counsel for the defendants, taking cognizance of the character of the turtles in question and the purposes to which they are used as food for human consumption, I feel called upon to rule as to whether the act of commission on the part of the defendant Smith in placing the turtles in the manner already stated in a wagon for transportation to the warehouse constitutes "torture" or "cruelty" whereby unjustifiable physical pain was caused or permitted.

There can be no doubt that the piercing of the fins of the said turtles and tying them by means of thongs is painful to some degree to the turtle; but no witness testified at the examination that the carrying of turtles on the end of their shell was either cruel or inhuman or caused the turtles pain. The only expression of opinion to be obtained from the witness Dr. Reid Blair, a veterinarian called as an expert in behalf of the people, is that he thought the carrying of turtles in that way would cause some discomfort to them. I am of the opinion that the placing of the said turtles on the vehicle for transportation from the pier to the warehouse in the manner described is not cruelty within the meaning of the statute applicable to the facts of this case. The torture that would justify a criminal prosecution must be some mode of inflicting bodily pain that is unjustifiable and unnecessary; but if the pain and suffering is temporary, unavoidable without criminal intent, and necessary to preserve the safety of the property involved and to overcome any danger or injury to such property, then it is not torture as that term is employed in legal parlance. I attach considerable importance to the use of the word "unjustifiable" in connection with the legislative definition of torture or cruelty. It clearly indicates legislative intent and shows that the Legislature had in mind that while in certain cases there may be physical pain and suffering, even to the extent of causing death, no criminal proceeding can be sustained unless the pain or cruelty was unnecessary, unjustifiable, and willful. People v. Beattie, 96 App. Div. 383, 389, 89 N. Y. Supp. 193. The infliction of pain alone is insufficient for the purpose of such a prosecution as this; but the question is: Was unjustifiable pain inflicted? The statute itself contemplates and permits the infliction of a certain amount of pain. Certain physical pain may be necessary and justifiable in given cases.

I would call it a legal license permitting the infliction of unavoidable pain. Many are the cases where animals suffer or are permitted to suffer physical pain, but it is insufficient in law to warrant a holding by a committing magistrate. By biblical mandate man was given "dominion over the fish of the sea, over the fowls of the air and the beasts, and the whole earth and every creeping creature that moveth upon the earth." Man is superior to animals, and some of them he uses for food and is permitted to slaughter them. Many are the means he employs for such purpose, and in such cases the incidental pain and suffering is treated as necessary and justifiable. It must have come to the attention of many that the treatment of "animals" to be used for food while in transit to a stockyard or to a market is sometimes not short of cruel and, in some instances, torturable. Hogs have the nose perforated and a ring placed in it; ears of calves are similarly treated; chickens are crowded into freight cars; codfish is taken out of the waters and thrown into barrels of ice and sold on the market as "live cod"; eels have been known to squirm in the frying pan; and snails, lobsters and crabs are thrown into boiling water.

Irrespective of the devious means that might be adopted to destroy life before these cruelties are perpetrated upon them, still no one has raised a voice in protest. These practices have been tolerated on the theory, I assume, that, in the cases where these living dull and cold-blooded organisms are for food consumption, the pain, if any, would be classed as "justifiable" and necessary.

The question as to whether the pain caused to such creatures, often classed as dull nervous organisms, is "justifiable" or not, cannot be easily answered. Public opinion at different times among different races has swung from one extreme to the other. The Emperor Augustus nearly exterminated peacocks to regale himself in Rome with their brains. To-day the world would hold their death unjustifiable. Then, again, juries and magistrates of different localities, races, or education, with varying ideas of taste and cuisine, may hold widely divergent ideas as to whether the improved flavor of lobster boiled alive makes such torture "justifiable."

Counsel for one of the defendants argues with force that sheep and hogs standing on their feet during a transit by rail in the ordinary double-decked cattle car are much in excess of discomfort, and that the federal statutes in reference to this transit, though inspired by humanitarian impulses, do not place the ban upon it, where the transportation does not occupy more than 24 hours. The defendants further argue that the testimony of Dr. Blair, a zoölogist, attached to New York Zoölogical Park for many years, does not establish conclusively that the turtles in question were subjected to unjustifiable pain. Dr. Blair testified that upon visiting the steamer he found the turtles lying on the deck on two planks, one under the head and the other under the back part near the tail, that their front and hind flippers were pierced and tied with manila rope, and that he noticed that some of the flippers had been torn away from the cord, and on others there was some blood under the flippers and under the carapace. One turtle was dead. He further testified as to the tests he

made to determine the sensitiveness of the flipper by pricking it with a pin near the opening, and that thereupon the "animal" quickly drew the flipper away. He described a flipper as triangular in shape, being about 8 to 10 inches long and 5 inches wide, with a skin about a thirty-second of an inch thick, having muscles and blood vessels, and at the point of perforation tendons and ligaments, skin nerves, and blood vessels, connecting with other parts of the body, which possesses a nervous system. He admits that the flippers are mostly flexible cartilage. His experience developed the fact that he had operated on turtles often to remove fibrous growths which are common in the aquarium where they are on concrete floors, and he states that he has always found these operations very painful to the turtle; some cases requiring the use of cocaine. On cross-examination his testimony establishes that the turtle is cold blooded, colder than human blood, and that the habitat of the turtle is in and around the deep waters of Florida, West Indies, and Key West, where they live on soft foods. Their importation is usually for purposes of exhibition or food. He gives it as his opinion that the strictly humane method of transporting the turtle is in tanks, but he admits that they may be placed in wooden crates covered with burlap, in which the turtle rests on the "belly" or plastron, so that the flippers may not be made secure, and in this manner, he adds, they cannot injure themselves. Counsel for the defendants elicited from Dr. Blair that if the turtles were shipped without tying their flippers they might do themselves injury.

[3] What constitutes cruelty is a question of fact on all the evidence in a prosecution for cruelty to animals. People v. Tinsdale, 10 Abb. Prac. (N. S.) 374. So far as the defendant Smith is concerned, I am not satisfied that he has been guilty of any willful infliction of unavoidable pain, or that he criminally intended to visit pain on these turtles in their transportation from ship to warehouse, and therefore I must dismiss the complaint which treats with that matter. Furthermore, in analyzing the evidence adduced against him under the second complaint, I find that there is no proof that the defendant Smith either carried or caused the turtles to be carried on the Saratoga. It cannot be inferred from the fact that, because Smith was the consignee of the shipment of turtles, he in any wise was party to the crime charged against Capt. Downs or is responsible for the condition of the turtles in transit.

When and how the consignee became vested with the title to the turtles has been left to speculation. It is true, though, that he admitted having been in the business of receiving turtles in the same manner as here described for 25 years, and that it has been a custom or common way to receive them in practically the same condition all during that time; but there is an hiatus in the record that he ever carried them or caused them to be carried in the manner claimed to be criminal. A court cannot speculate or draw unfavorable inferences from proof which is susceptible of an innocent construction. The cutting of the strings or thongs which held the turtles' flippers was done at the behest of the defendant Smith on the deck of the

steamer, at the dock, and before the transfer of the turtles from the steamer to the transporting vehicle, upon the actual delivery of the turtles. Their immediate transportation from an exposed position in inclement March weather to a warehouse, where the turtles would be properly kept and sustained, is indicative, if, of anything, that the defendant Smith did not intend to inflict such pain and cruelty upon these turtles as is prohibited by statute, but as soon as possible relieved them of whatever pain and suffering was caused by the thongs holding the flippers together. For these reasons I feel called upon and am bound to dismiss the second complaint against him.

[4] The contention is advanced by Capt. Downs' counsel that a state court cannot entertain jurisdiction of the alleged offense since the shipment of turtles is foreign commerce, which is regulated solely by federal enactment, and the federal courts have exclusive jurisdiction. Has the local sovereignty been offended? A crime is essentially local and can be prosecuted and punished only in the sovereignty offended. People v. Martin, 77 App. Div. 396, 79 N. Y. Supp. 340, affirmed 175 N. Y. 315, 67 N. E. 589, 96 Am. St. Rep. 628. The people's contention is that, although the captain (Downs) cannot be held responsible for the perforation and tying of the fins of these turtles, nor for the placing of the turtles on their backs, he suffered the animals to be brought within the boundary of the state of New York and omitted to relieve them from a condition that is claimed to be cruelly painful.

The Constitution of the United States (article 1, § 8) provides:

"The Congress shall have power * * * to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

[5] "Commerce," as used in the Constitution, involves trade and commercial relations and intercourse among citizens of different states or countries and comprehends navigation between the United States and foreign countries, and the transportation by land or water of persons or property between the different states and foreign countries constitutes interstate and foreign commerce. State Tonnage Tax Cases, 12 Wall. 204, 20 L. Ed. 370; State Freight Tax Cases, 15 Wall. 232, 21 L. Ed. 146.

Each state has a right to regulate its domestic affairs, which in no wise are federal in character. To what extent this frequently designated police power may go in the regulation of state affairs, which directly or indirectly affect commerce, is a problem. The most perplexing topic of American constitutional law seems to be the demarcation of the federal power over commerce, and the power of the states and nation have been referred to as like the intervening colors between black and white, which approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them. Hall v. De Cuir, 95 U. S. 485, 486, 24 L. Ed. 547. When the Constitution thus expressly authorizes Congress to control and regulate such commerce, it conversely negatives, as is stated in defendants' brief, any authority in the states also to regulate it. Walling v. Michigan, 116 U. S. 446, 455, 6 Sup. Ct. 454, 29 L. Ed.

691; Bowman v. Chicago, etc., Ry., 125 U. S. 465, 507, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; Leisy v. Hardin, 135 U. S. 100, 108, 10 Sup. Ct. 681, 683 [34 L. Ed. 128]. The Supreme Court, writing in the Leisy Case, supra, says:

"The power vested in Congress 'to regulate commerce with foreign nations and among the several states and with the Indian tribes' is a power to prescribe the rule by which that commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those prescribed in the Constitution. It is coextensive with the subject on which it acts and *cannot be stopped at the external boundary of a state.*"

The settled law now is, and has been since the United States Supreme Court wrote it in 1824, in the cases of Gibbons v. Ogden, 9 Wheat. 186, 6 L. Ed. 23, interpreting the commerce clause of the Constitution, that Congress alone has the power to regulate commerce—foreign or interstate—and that it is supreme in such cases, thus placing with the federal authorities control over a subject which under the confederation of states was dealt with locally, and when the power of regulation was distributed among them to the demoralization of commerce, and the relations which spring from it, for the want of a unit or standard to serve as a guide in all cases alike. By a long line of consistent decisions this rule has been maintained, and the spirit and letter of the Constitution has been held inviolable in this regard.

In the earlier cases, Chief Justice Marshall ruled that the power granted Congress precluded all right in the states to legislate in any wise in relation to the regulation of such commerce. Later decisions of that august tribunal seem to recognize this rule with certain qualifications, and more particularly as to legislation which is purely local in its character and which affects indirectly the *object* of the foreign commerce as distinguished from laws which regulate it, and thereby conflict with the exercise of the power by Congress. Mr. Justice McLean, in his opinion in Smith v. Turner (U. S.) 7 How. 283, 400, 12 L. Ed. 702, says:

"In giving the commercial power to Congress the states did not part with that power of self-preservation which must be inherent in every organized community. *They may guard against the introduction of anything which may corrupt the morals or endanger the health or lives* of their citizens. Quarantine or health laws have been passed by the states, and regulations of police for their protection and welfare."

At page 402 of 7 How. (12 L. Ed. 702) he continues:

"No one has yet drawn the line clearly, because, perhaps, no one can draw it, between the commercial power of the Union and the municipal power of a state. Numerous cases have arisen, involving these powers, which have been decided; but a rule has necessarily been observed as applicable to the circumstances of each case. And so must every case be adjudged. A state cannot regulate foreign commerce, but it may do many things which more or less affect it."

[6] While the state has the right by the exercise of its police powers to legislate in local matters (Central of Georgia Ry. v. Murphey, 196 U. S. 194, 25 Sup. Ct. 218, 49 L. Ed. 444, 2 Ann. Cas. 514), it is also true that a state must not tax, burden, or restrict by

laws, even which operate wholly within its own jurisdiction, interstate or foreign commerce (Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; People v. Hawkins, 157 N. Y. 1, 51 N. E. 257, 42 L. R. A. 490, 68 Am. St. Rep. 736; City of Buffalo v. Reavey, 37 App. Div. 228, 55 N. Y. Supp. 792; People v. Fargo, 137 App. Div. 727, 122 N. Y. Supp. 553).

[7] There can be no doubt that persons have a right to bring into the country merchandise for disposition in the commerce of the land without hindrance or restriction on the part of the state into or through which it comes, and that until such merchandise becomes part of and is mixed with the general mass of the property of the state, the state government cannot treat it as local property. U. S. v. Col. & N. W. R. R., 157 Fed. 321, 85 C. C. A. 27, 15 L. R. A. (N. S.) 167, 13 Ann. Cas. 893; McNeill v. So. Ry., 202 U. S. 543, 26 Sup. Ct. 722, 50 L. Ed. 1142. The power of regulation of such commerce by Congress is paramount throughout the Union. Reid v. Col., 187 U. S. 137, 146, 23 Sup. Ct. 92, 47 L. Ed. 108. These principles, broadly speaking, are the fundamentals of centralized government, granting power to the national authorities to *regulate* concerning a most vital institution—foreign and interstate commerce—so as to avoid any conflict between the powers remaining with the state and those vested in Congress by the Constitution.

The Court of Appeals in its opinion in the case of People v. Erie Railroad Co., 198 N. Y. 369, at page 377, 91 N. E. 849, at page 851 [29 L. R. A. (N. S.) 240, 139 Am. St. Rep. 828, 19 Ann. Cas. 811], says:

"As is well understood, the general subject of commerce for the purpose of defining federal and state jurisdiction in legislation may readily be divided into three fields. The first is that in which the power of the state is exclusive; second, that in which the state may act in absence of legislation by Congress, which is controlling and exclusive; the third, that in which the authority of Congress is exclusive and the states cannot interfere at all." Covington & C. Bridge Co. v. Kentucky, 154 U. S. 204, 209, 14 Sup. Ct. 1087, 38 L. Ed. 962.

The case at bar comes clearly within the second class, and therefore I must inquire if there is any federal statute under the subject of this inquiry. I find that certain rules for carrying explosives, horses, cattle, etc., with the penalties for the violation thereof, are prescribed by a law passed by Congress August 2, 1882 (22 Stat. 189, c. 374, § 8 [U. S. Comp. St. 1901, p. 2931]). Later Congress passed the 24-Hour Law, supra, for the care of animals in transit. Under this law the carrier of the turtles in question may be prosecuted for failure to provide food and sustenance to those turtles while in transit; but that question does not come before me under the complaint herein.

[8] The Congress also provided, in section 241 of the Federal Penal Code as follows:

"The importation into the United States, or any territory or district thereof, of the mongoose, the so-called 'flying foxes,' or fruit bats, the English sparrow, the starling, and such other birds and animals as the Secretary of Agriculture may from time to time declare to be injurious to the interests of

agriculture or horticulture, is hereby prohibited; and all such birds and animals shall, upon arrival at any port of the United States, be destroyed or returned at the expense of the owner. No person shall import into the United States or into any territory or district thereof, any foreign wild animal or bird, except under special permit from the Secretary of Agriculture, provided, that nothing in this section shall restrict the importation of natural history specimens for museums or scientific collections, or of certain cage birds, such as domesticated canaries, parrots or such other birds as the Secretary of Agriculture may designate. The Secretary of the Treasury is hereby authorized to make regulations for carrying into effect the provisions of this section."

It is clear that this statute is not applicable. My research has led to no other statute or regulation enacted by Congress, which in any wise affects animals transported in foreign commerce. The state statute (Penal Law, § 189), which makes it a misdemeanor to carry animals in a cruel and inhuman manner, is the only enactment which may be applied here, so that we have a state act, "in the absence of legislation by Congress, which is controlling and exclusive."

[9] There has been no proof before me that the preparation and transportation of the turtles in the manner described was an offense at the point of their shipment, and it is an interesting question of jurisdiction, involving as well principles of international law, as to whether we can change the character of a continuing act from a lawful one in foreign waters to an offense against this state when the vessel reaches the waters and navigable rivers under the civil and criminal jurisdiction of this state. Mr. Freeman Snow, in his second edition (1898) of International Law, at page 38, says:

"The transportation of persons or of property of certain descriptions may be lawful commerce within the foreign jurisdiction, but may be forbidden by the laws of the State to which the ship belongs."

And until Congress passes an act either permitting or prohibiting such conduct and acts as is charged against the defendant here, it seems to me that there can be no just claim that the state has encroached on federal authority. As Mr. Justice Marshall stated in the case of Gibbons v. Ogden, supra:

"It has been observed that the powers remaining with the state may be so exercised as to come in conflict with those vested in Congress. When this happens, that which is not supreme must yield to that which is. This great and universal truth is inseparable from the nature of things, and the Constitution has applied it to the often interfering powers of the general and state government as a vital principle of perpetual operation."

I feel bound to follow the law as expressed by the Court of Appeals in the case of People v. Erie R. R., supra, in defining national and state power in matters which affect foreign and interstate commerce. States should be jealous of their police powers and of any encroachment on them. And although the exercise of such powers might have an indirect effect over commerce, still the courts and judiciary should seek to preserve and maintain unimpaired to the sovereignty of such a state the power to regulate in its own affairs. The state may, in the exercise of its police powers, enact laws for the safety and health of its citizens, and promote their peace, morals, education, and good order by law. These are properly state matters.

The statutes which prohibit cruel and barbarous acts toward animals have been unheld on the theory that such acts tend to corrupt the public morals. Commonwealth v. Turner, 145 Mass. 296, 14 N. E. 130. Legislation which affects the transportation of live stock or animals within this state so as to penalize unnecessary cruelty should be sustained as a proper exercise of the police power in no way repugnant to federal authority.

Let us suppose that the state laws regulate the quantity of high and powerful explosives that may be lawfully carried in a given manner, or that diseased cattle or decomposed produce shall not be placed at given points within the state. Should the right of the state be questioned in these cases? Imagine the great danger involved in each supposed case were the freight to be forced in our midst upon the plea of its foreign commerce character under the commerce clause, which would seem in that line of cases to open the door wide and permit the dangerous or infected shipment to enter regardless of consequences to the community most affected. For another illustration, suppose that one of the dead turtles was placed on the dock by the captain or taken to the warehouse by the consignee bound in the manner above described. Under the "original package" theory, it would still remain foreign commerce and above the state law if the state were powerless to legislate in such manner as to prohibit it. Would it seem logical to hold that local laws of the board of health should not be permitted to intervene for the security of the public health, even though the turtle was permitted to remain there while a state of putrefaction developed? There is no positive and absolute inhibition in our Penal Law under consideration against the importation of turtles, and I do not see how this law operates upon interstate or foreign commerce as to amount to a regulation thereof and to conflict with the paramount authority conferred upon Congress. In the cases of Leisy v. Hardin, Lyng v. Michigan, 10 Sup. Ct. 725, and City v. Reavey, supra, the state law under consideration there prohibited the sale and introduction of the commodity in commerce, and they present clear cases of an attempt to regulate commerce.

The only remaining question in the case before me is to determine whether the defendant Downs is probably guilty of a deliberate act of cruelty. Cruelty to a beast was punishable at common law as a misdemeanor, where there was proof of a deliberate act of cruelty. Isaac Ross's Cases, 3 City H. Rec. 191 (C. T. 1818). The statute law now in force makes such an act of cruelty a misdemeanor, and since the defendant Downs was the master of the Saratoga at the time he accepted the shipment of the turtles, presumably knowing the law of this state, for the purpose of carrying them to the port of New York, he must be held as one who carries or caused to be carried in and upon a vessel animals in a cruel and inhuman manner.

The questions which this record presents are of such great importance that they ought to be subject to judicial review in a federal tribunal.

It appearing to me by the depositions and the evidence presented that the crime there mentioned has been committed, and there is suffi-

cient cause to believe the defendant Downs guilty thereof, I order that he be held to answer the same and he be admitted to bail in the sum of $500 and be committed to the warden and keeper of the city prison until he give such bail.

(76 Misc. Rep. 106.)

### In re WALL.

(Surrogate's Court, Kings County.    March, 1912.)

WILLS (§ 651*)—CONSTRUCTION—CONDITIONS—VALIDITY.

Where a will directs payment of the net income of a trust fund to testator's son for life, with remainder over, a condition that the gift shall fail if the son contests the will is void.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 1542; Dec. Dig. § 651.*]